ORIGINAL

1  **PETER NISSON, ESQ.**        **SBN#62276**
   100 North Brand Blvd. Suite 600
2  Glendale, CA 91203
   c/o TBFC
3  1888 Kalakaua Avenue Suite C-312
   Honolulu, HI 96815
4  Tel. No. (888)999-4313
   FAX     (888) 999-5764
5  info@nissonlaw.com
   Attorney for Plaintiffs
6

7  Appearing in Hawaii Jurisdiction Pro Hac Vice

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAY 16 2012

at 9 o'clock and 52 min. A. M.
SUE BEITIA, CLERK

8              **UNITED STATES DISTRICT COURT**
                    **DISTRICT OF HAWAII**
9

10
   VIOLETA BAUTISTA CASTILLO;          )   Case No.: CV12 00261 DAE KSC
11 CARMELITA C. UY; JERRY              )
   AGBANNAOAG and MERLITA              )   **COMPLAINT FOR:**
12 AGBANNAOAG; ESTEBAN AGONIAS         )   1.  **Conversion**
   and ILUMINADA AGONIAS; EVELINA      )   2.  **Conspiracy to Commit Conversion**
13 ALEJANDRO; RUBEN AMBROCIO and       )   3.  **Intentional Misrepresentation**
   JUDY AMBROCIO; LANEBERT             )   4.  **Fraudulent Concealment**
14 AREOLA and EMELITA AREOLA;          )   5.  **Promissory Estoppel**
   TEOFILO BENICTA; MARGARITA          )   6.  **Negligent Misrepresentation**
15 BUCCAT-CULBENGAN; CHARITO           )   7.  **Breach of the Covenant of Good**
   CHICHIOCO; LOURDES CHUN;            )       **Faith and Fair Dealing**
16 JACINTE DAGDAGAN and RODELYN        )   8.  **Unjust Enrichment**
   DAGDAGAN; LIZZELE DULAY, CESAR      )   **And Demand For Jury Trial**
17 DULAY and TANYA DULAY; SULPICIO     )
   EUGENIO and VICTORIA SANTOS;        )
18 RONNIE GRAY, LAWRENCE IMANIL,       )
   ANNABELLE LANGCAY, RENATO           )
19 MABALLO, EDWIN MANALANG and         )
   LETICIA MANALANG,                   )
20 ELPIDIO MARQUEZ and BELLA           )
   TOMAS MARQUEZ, NATIVIDAD            )
21 NAVARRO, ARMANDO BAUTISTA and       )
   JUANITA BAUTISTA, ERNESTO           )
22 NAVARRO and MARIA NAVARRO,          )
   ERIC ONG, JESUS LIM, EUFEMIA        )
23 PASTOR and CHERRY VIC PASTOR-       )
   REGANIT, PAUL PATRICK and AQUA      )
24 PATRICK, REYNE RAMIRO and JEAN      )
25

**RAMIRO, CRAIG TAKUSHI and GINA**
**TAKUSHI, JOCELYN ULAT and**
**ALFRED ULAT, EUSTAQUIO UY,**
**ILUMINADA VICTORINO, CESAR**
**RAMON VIDAD and MARIA SUSANA**
**VIDAD; FELICIANO DELA CRUZ and**
**MARIA CORAZON DELA CRUZ; All**
**Individuals, on behalf of themselves and all**
**others similarly situated, and ROES 35**
**through 5000, inclusive,**

Plaintiff,

vs.

MORTGAGE ELECTRONIC SYSTEMS,
INC. aka MERS, INC.; ONE WEST BANK,
FSB; BANK OF AMERICA, N.A.; AAMES
FUNDING CORPORATION; GUILD
MORTGAGE COMPANY; WELLS FARGO
BANK, N.A.; WELLS FARGO BANK, N.A.
dba AMERICAN SERVICING COMPANY;
WELLS FARGO HOME MORTGAGE OF
HAWAII, LLC; HSBC MORTGAGE
SERVICES; WELLS FARGO HOME
MORTGAGE; CITIMORTGAGE, INC.;
FLAGSTAR BANK; LITTON LOAN
SERVICING, LP; ARGENT MORTGAGE
COMPANY, LLC. ; AMERIFUND
FINANCIAL, INC. dba ALL FUND
MORTGAGE; FINANCE FACTORS
LIMITED; COUNTRYWIDE HOME
LOANS, INC.; PLAZA HOME MORTGAGE,
INC.; AAMES FUNDING CORPORATION
dba AAMES HOME LOAN; PEOPLE'S
CHOICE HOME LOAN, INC.;
ACCREDITED HOME LENDERS, INC.;
WASHINGTON MUTUAL BANK, FSB;
SECURITY NATIONAL MORTGAGE
COMPANY; MORTGAGEIT, INC.; NEW
CENTURY MORTGAGE CORPORATION;
LOAN NETWORK, LLC; FREMONT
INVESTMENT AND LOAN; PINNFUND,
USA; CITIZEN MORTGAGE; FIRST
MAGNUS FINANCIAL CORPORATION;
ALLIANCE BANCORP; BNC MORTGAGE,
INC.;  HOMESTREET BANK; NEW
WORLD MORTGAGE, INC. RBC

MORTGAGE COMPANY; MAX DEFAULT
SERVICES CORP.; BENEFICIAL
FINANCIAL I, INC.; HSBC BANK USA,
N.A.; THE BANK OF NEW YORK
MELLON; DEUTSCHE BANK, NTC;
LASALLE BANK, N.A.; INDYMAC INDX
MORTGAGE LOAN TRUST 2005-AR6;
BANC OF AMERICA ALTERNATIVE
LOAN TRUST 2006-9; BCAP LLC TRUST
2007-AA1; STRUCTURED ASSET
SECURITIES CORPORATION
MORTGAGE LOAN TRUST 2006-BC2;
HSBC HOME LOAN EQUITY TRUST 2005-
3; FEDERAL NATIONAL MORTGAGE
ASSOCIATION; FEDERAL HOME LOAN
MORTGAGE; ALTERNATIVE LOAN
TRUST 2007-8CB; WELLS FARGO
ALTERNATIVE LOAN 2007-PA6 TRUST;
CITIMORTGAGE ALTERNATIVE LOAN
TRUST (CMALT) SERIES 2006-A3; HSBC
HOME EQUITY LOAN TRUST (USA) 2006-
4; FREMONT HOME LOAN TRUST 2006-
D; PARK PLACE SECURITIES, INC.,
ASSET-BACKED PASS-THROUGH
CERTIFICATES SERIES 2005-WCW1;
ALTERNATIVE LOAN TRUST 2007-J1;
NOMURA ASSET ACCEPTANCE
CORPORATION ALTERNATIVE LOAN
TRUST, SERIES 2006-AR1; ARGENT
SECURITIES INC., ASSET-BACKED PASS-
THROUGH CERTIFICATES, SERIES 2005-
W5; ALTERNATIVE LOAN TRUST 2007-
17CB; CHL MORTGAGE PASS-THROUGH
TRUST 2005-24; IXIS REAL ESTATE
CAPITAL TRUST 2006-HE2;
CARRINGTON MORTGAGE LOAN TRUST
SERIES 2006-NC2; RASC SERIES 2005-
AHL3 TRUST; WAMU MORTGAGE PASS-
THROUGH CERTIFICATES, WMALT
SERIES 2005-8; CWABS ASSET BACKED
CERTIFICATES TRUST 2007-2; U.S.
BANK, N.A.; INDYMAC BANK, FSB;
BARCLAYS BANK, PLC; LEHMAN
BROTHERS HOLDINGS. INC.; HSBC
FINANCE CORPORATION; CWALT, INC.;
WELLS FARGO ASSET SECURITIES

CORPORATION; CITICORP SECURITIES
INC.; FREMONT MORTGAGE
SECURITIES CORPORATION; PARK
PLACE SECURITIES, INC.; NOMURA
ASSET ACCEPTANCE CORPORATION;
STRUCTURED ASSET SECURITIES
CORPORATION; CWMBS, INC.; MORGAN
STANLEY ABS CAPITAL I, INC.;
STANWICH ASSET ACCEPTANCE
COMPANY, LLC; RESIDENTIAL ASSET
SECURITIES CORPORATION;
WASHINGTON MUTUAL MORTGAGE
SECURITIES CORP.; CWABS, INC.;
SUSAN SMOTHERS; AMBER GARCIA;
BUD KAMYABI; SERENA HARMAN;
RHONA M. KANINAU; TRENA
PAPAGEORGE; MARIA VADNEY; KEVIN
DURHAM; KEVIN PRIESHOFF; DEREK
WONG; YVONNE WHEELER; KARTRYN
DOI; EMILIA LARA; LORRIE WOMACK;
MARTI NORIEGA; DENISE BALLEY; and
DOES 1 through 1000, inclusive,

                Defendant
_____

        Now comes Plaintiffs by and through counsel, and each of them, hereby demand a jury

trial and allege as follows:

## MULTI PLAINTIFF JOINDER COMPLAINT
## INTRODUCTION

        1.      This lawsuit arises from, among other things: (1)the deception in inducing

Plaintiffs to enter into loans and mortgages[1] from approximately 2003 through 2009 and which

were acquired or are serviced by Defendants; (ii) the fraudulent and illegal use of MERS in

connection with those loans and mortgages; (iii) Defendants' breach of Plaintiffs' statutorily

protected rights; (iv) Defendants' breach and willful violation of numerous consumer and

homeowner protection statutes, and willful violations of unfair business practices statutes, by, among other things, processing money from unknown sources, in contravention of the Patriot Act; (v) accepting money, transferring alleged assets and foreclosing upon alleged assets in instances where the alleged assets do not exist, and in which these Defendants have no right, title, or interest upon which they can act; and (vi) Defendants' continuing conversion and other tortuous conduct intended to deprive Plaintiffs of their money, property and legal rights and remedies for the foregoing acts, as described more fully below.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over each of the non-domiciliary Defendants because each of them transacts business within the State of New York within the meaning of CPLR § 302(a)(1) and each of them committed a tortuous act inside the State of New York or outside the State of New York causing injury within the State of New York within the meaning of CPLR §§ 302(a) and 302(a)(3).

3.      Venue is proper in this Court pursuant to Section 503 of the CPLR, as all Defendants are either domiciled in this county, or they regularly conduct business there and avail themselves of the benefits and protection of New York law there.

## THE PARTIES

4.      Plaintiff VIOLETA BAUTISTA CASTILLO is a resident of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 1.).

5.      Plaintiff CARMELITA C. UY is a resident of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 2.).

6.      Plaintiff JERRY AGBANNAOAG and MERLITA AGBANNAOAG are residents of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 3.).

7.      Plaintiff **ESTEBAN AGONIAS and ILUMINADA AGONIAS** are residents of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 4.).

8.      Plaintiff **EVELINA ALEJANDRO** is a resident of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 5.).

9.      Plaintiff **RUBEN AMBROCIO and JUDY AMBROCIO** are residents of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 6.).

10.     Plaintiff **LANEBERT AREOLA and EMELITA AREOLA** are residents of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 7.).

11.     Plaintiff **TEOFILO BENICTA** is a resident of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 8.).

12.     Plaintiff **MARGARITA BUCCAT-CULBENGAN** are residents of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 9.).

13.     Plaintiff **CHARITO CHICHIOCO** is a resident of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 10.).

14.     Plaintiff **LOURDES CHUN** is a resident of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 11.).

15.     Plaintiff **JACINTE DAGDAGAN and RODELYN DAGDAGAN** is a resident of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 12.).

16.     Plaintiff **LIZZELE DULAY** is a resident of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 13.).

17.     Plaintiff **CESAR DULAY and TANYA DULAY** are residents of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 14.).

18.     Plaintiff **SULPICIO EUGENIO and VICTORIA SANTOS** are residents of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 15.).

19.     Plaintiff **RONNIE GRAY** is a resident of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 16.).

20.     Plaintiff **LAWRENCE IMANIL** is a resident of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 17.).

21.     Plaintiff **ANNABELLE LANGCAY** is a resident of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 18.).

22.     Plaintiff **RENATO MABALLO** is a resident of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 19.).

23.     Plaintiff **EDWIN MANALANG and LETICIA MANALANG** is a resident of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 20.).

24.     Plaintiff **ELPIDIO MARQUEZ and BELLA TOMAS MARQUEZ** are residents of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 21.).

25.     Plaintiff **NATIVIDAD NAVARRO** is a resident of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 22.).

26.     Plaintiff **ARMANDO BAUTISTA and JUANITA BAUTISTA** are residents of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 23.).

27.     Plaintiff **ERNESTO NAVARRO and MARIA NAVARRO** are residents of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 24.).

28.     Plaintiff **ERIC ONG and JESUS LIM** are residents of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 25.).

29.     Plaintiff **EUFEMIA PASTOR and CHERRY VIC PASTOR-REGANIT** is a resident of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 26.).

30.     Plaintiff **PAUL PATRICK and AQUA PATRICK** is a resident of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 27.).

31.     Plaintiff **REYNE RAMIRO and JEAN RAMIRO** are residents of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 28.).

32.     Plaintiff **CRAIG TAKUSHI and GINA TAKUSHI** are residents of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 29.).

33.     Plaintiff **JOCELYN ULAT and ALFRED ULAT** is a resident of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 30.).

34.     Plaintiff **EUSTAQUIO UY** is a resident of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 31.).

35.     Plaintiff **ILUMINADA VICTORINO** is a resident of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 32.).

36.     Plaintiff **CESAR RAMON VIDAD and MARIA SUSANA VIDAD** are residents of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 33.).

37.     Plaintiff **FELICIANO DELA CRUZ and MARIA CORAZON DELA CRUZ** are residents of the State of HAWAII and had a mortgage loan that was originated or serviced by one of the Defendants herein. (This Plaintiff shall be designated as Plaintiff No. 34.)

[Summary of pleading] - 9

38.   Each Plaintiff herein had ownership and possession of funds – material to the allegations herein – in a sum more than $75,000.00, as of January 23, 2003 to December 31, 2009.

39.   Each Plaintiff worked hard for these funds and earned them, paid state and federal taxes on them, and had the exclusive dominion and control over them.

40.   Through the wrongful conduct set forth in this complaint, the Defendants – and each of them – converted all of said funds and have continued the hiding and secreting of these funds from the period beginning on or about January 22, 2003 and continuing at all times thereafter.

41.   At all times, the Defendants – and each of them, as they entered the conspiracy alleged herein – continued to hid and secrete the converted funds despite demands that they cease and desist from doing so by the Plaintiffs.

42.   Plaintiffs neither consented to nor ratified the Defendants' conversion of their money as set forth in this complaint.

43.   Defendant **MORTGAGE ELECTRONIC SYSTEMS, INC. aka MERS, INC.** is party to the creation of a negotiation trail of all Defendants' negotiable instruments in a way to create an appearance of propriety under the Uniform Commercial Code.   (This Defendant shall be designated as Defendant No. 1)

44.   Defendant **ONE WEST BANK, FSB.** is party to the creation of a negotiation trail of all Defendants' negotiable instruments in a way to create an appearance of propriety under the Uniform Commercial Code.   (This Defendant shall be designated as Defendant No. 2).

45.   Defendant **MORTGAGE ELECTRONIC SYSTEMS, INC. aka MERS, INC.** is party to the creation of a negotiation trail of all Defendants' negotiable instruments in a

way to create an appearance of propriety under the Uniform Commercial Code. (This Defendant shall be designated as Defendant No. 1)

46. Defendants 151-1808 are all entities of unknown form. a.) located and doing business in New York, New York, and b.) in the business of creating a negotiation trail of all Defendants' negotiable instruments (including, but not limited to promissory notes) in a way to create an appearance of propriety under the Uniform Commercial Code. These Defendants are collectively referred to hereinafter as "New York Loan Pools".

47. At all times material hereto, the business of Defendants was operated through a common plan and scheme designed to conceal from Plaintiffs the material facts set forth below. Such facts were also concealed from the public and from regulators, either directly or as successors-in-interest to the business acquired from others. The concealment was completed, ratified and/or confirmed by each Defendant herein directly or as a successor-in-interest as the acquirer of an entire business, and each Defendant performed or has sought to benefit from the tortuous acts set forth herein for its own monetary gain and as a part of a common plan developed and carried out with the other Defendants or as a successor-in-interest to the business that did the foregoing.

48. Plaintiffs allege that each of the wrongful acts or omissions described below was performed either by each Defendant herein, named or unnamed, or ratified and adopted by each Defendant after its occurrence.

49. Further, those Defendants that did not actively perform the acts or omissions described in this Complaint did affirmatively aid and abet the other Defendants in the performance of such acts of omissions, before, during or after the fact.

50. Finally, each Defendant herein, named or unnamed, did knowingly derive some form of profit or benefit from the acts and omissions described herein.

51.     All Defendants agreed to work together in the conspiracy and/or joint enterprise described in this Complaint based upon an express agreement among all Defendants to convert plaintiffs' monies and personally in the manner described herein.   Accordingly, each Defendant, named or unnamed, should be held liable for the acts and omissions of all other Defendants with respect to the causes of action set forth below.

52.     The true names and capacities of the Defendants listed herein as DOES 2 through 1,000 are unknown to Plaintiffs who therefore sue these Defendants by such fictitious names.   Upon learning the true names and capacities of the DOE Defendants, Plaintiffs shall amend this Complaint accordingly.

53.     Each of the Defendants herein, named or unnamed, was the agent of each of the other Defendant herein, named or unnamed, and thereby participated in all of the wrongdoing set forth below.   Thus, each such Defendant is responsible for the acts, events and concealment of every other such Defendant as set forth below.

### FACTS COMMON TO ALL COUNTS

54.     Defendants' wrongful acts include (but are not limited to) the following (i) claiming to be servicer of the subject notes at issue herein and demanding monthly loan payments therefore, when in fact no Defendant had or has any legal claim to the monies paid to it by Plaintiffs; (ii) taking loan payments every month from each Plaintiff without crediting any portion of that money to the benefit of any Plaintiff; (iii) promising loan modifications to Plaintiffs while never being an authorized legal representative of any person in a position to actually modify Plaintiff's loans; (iv) inducing Plaintiffs to default on their loans so that Defendant could not profit from the credit default swaps they had purchased, betting that such loans would not be paid as agreed; (v) creating false reasons for charging fees to Plaintiffs based upon nonexistent monies owed, then instituting foreclosure proceedings against Plaintiffs based upon nonexistent monies owned, then instituting foreclosure proceedings

against Plaintiffs when such fees went unpaid; (vi) issuing wrongful Notices of Default, Notice of Acceleration, or Notice of Foreclosure to Plaintiffs; (vii) by refusing to respond, in any way, to Plaintiffs' communications or to communications made for Plaintiffs by their private and public representatives; (viii) converting Plaintiffs' monies as alleged in great detail below, (ix) secreting such acts of conversion through the massive international network used by defendants to support their Ponzi scheme in violation of law.

### A.   Ponzi Scheme and Conversion

55.    This is the largest scheme in United States history where domestic banking institutions – on an international basis, involving all Defendants herein and their co-conspirators operating together in a common enterprise as set forth below – engaged in an institutional, worldwide scheme to steal, rob and convert the personal property, money and proceeds of such assets of each Plaintiff herein on the dates, in the sums and with the *modus operandi* set forth below.

56.    This *modus operandi* of Defendants herein includes their decade-long and systematic conversion and "Ponzi scheme" approach that damaged millions of borrowers across the United States.

### B.   Details of Defendants' Scheme

57.    Defendants' elaborate scheme consisted of – and continues to consist of – numerous business designs, structures and arrangements operated by all Defendants herein. These have included enterprises of each Defendant as set forth below, that dealt in the converted assets of tens of thousands of American homeowners – including the Plaintiffs herein-and secretly transferred them nationally and internationally into a gigantic ongoing "Ponzi scheme".

58.    Because of the economic meltdown of 2007 and beyond, this Ponzi scheme has required the creation of more and more shell entities, and other money-raising vehicles used by

Defendants herein in order to support the raising of additional money in order to continue to hide the converted assets.

59.     The entire purpose of Defendants' Ponzi scheme has been to hide the converted assets of Plaintiffs (and other victims similarly situated) deeply and entirely so that Plaintiffs and other victims become incapable of ever recovering the funds and personally converted from them.

60.     The assets unlawfully converted and stolen by all Defendants as a part of their conspiracy, as well as instrumentalities used by all Defendants to continue the conversion and secreting of Plaintiffs' assets that are known as of April 9, 2012, included and continue to include the following:

   a.  Plaintiffs' money, as set forth below (conversion);

   b.  Negotiable instruments improperly negotiated under state and federal law, as set forth below (instrumentality);

   c.  Private identity information of certain Plaintiffs, as set forth below (conversion);

   d.  Other private information of certain Plaintiffs taken by Defendants in violation the provisions of the United States Constitution, as alleged below (conversion);

   e.  Mortgages or deeds of trust transferred secretly in violation of law, as set forth below (instrumentality);

   f.  Mortgaged-backed securities used merely to shield and hide the movement of assets converted from Plaintiffs outside of the United States (instrumentality);

   g.  Bond or debt securities – which Defendants began calling "hybrid" securities during the pendency of this action – used merely to perpetuate the Ponzi scheme and thus shield and hide the movement of assets converted from Plaintiffs outside of the United States (instrumentality);

h. Money laundering of proceeds of the above-described activity, as set forth in detail below (conversion and instrumentality);

i. Conversion and larceny where Defendants, and each of them, intended to and did in fact use Plaintiffs' money and other converted property to perpetuate their Ponzi schemes through the use of thousands of companies internationally – funded with converted monies for the purpose of hiding the trail of conversion and secretion – involving trillions of dollars.

61. Without Defendants' theft of Plaintiffs' money and other property – as alleged herein – none of the mortgage, securities, money laundering and/or Ponzi schemes described herein could have been initiated, perpetuated or maintained. The money converted from the Plaintiffs and other consumers nationwide has always been the "fuel" for the schemes alleged herein.

62. Included in the scheme as a key instrumentality – but not the fundamental purpose of the scheme – was and is all Defendants' intention to foreclose on the homes of homeowners, including Plaintiffs here, with respect to promissory notes that are each void *ab initio* as a result of all Defendants' intentional violation of state and federal laws promulgated to assure complete transparency and compliance with all applicable laws with respect to the appropriate and lawful negotiation and transfer of such negotiable instruments.

63. Each Defendant herein is the agent, servant, and co-conspirator of each other Defendant and all Defendants herein operated with their core *modus operandi* to steal and convert the money and valuable personal property of each Plaintiff (and thousands of other victims) and then to transfer that stolen money (and property) to (a) the other Defendants herein, and to (b) other entities in at least 30 foreign countries according to proof.

64. In addition, Defendant BofA has admitted the involvement of co-conspirators (a) located in countries without treaties with the United States of America and (b) pursuant to

1   instruments and prospectuses that purport to dissuade (but not expressly prohibit) the

2   involvement of such foreign countries.

3        65.   Defendants, and each of them, have operated and continue to operate the largest

4   Ponzi scheme in world history with a plan that – at its inception – was intended to, did in fact

5   and continues to the present day to have as its object the theft and conversion of billions of

6   dollars from millions of homeowners, including Plaintiffs.

7        66.   Plaintiffs became caught up in the tangled Ponzi-scheme-web of Defendants

8   innocently under the   innocently under the guise of applying for a routine home loan or

9   refinancing of an existing home mortgage loan, and have been trying to recover back their

10   money in the sums alleged herein without success ever since.   Because of Defendants'

11   intentional and longstanding secretion of their prior and current unlawful conduct, the trail is

12   growing cold and will ultimately be frozen absent the issuance of immediate injunctive relief

13   as prayed for herein.

14        67.   Defendants have failed and refused to return Plaintiffs' money as alleged herein

15   despite (a) Plaintiff's repeated requests, (b) Defendants' promises to return the money and

16   property, on a consistent month-to-month basis, (c) Interventions by federal and state

17   government commanding Defendants to either return the money, or provide a transparent plan

18   identifying systems through which money and property could be identified, located and

19   legitimately returned otherwise accounted for.

20   **C.   The historical background of the Ponzi scheme.**

21        68.   The foregoing *modus operandi* of all Defendants herein – acting in concert with

22   each other and for the common goal of both stealing Plaintiff's money and then hiding any

23   documentary proof thereof – began in 2003.

24        69.   At that time, each Defendant (or their predecessors) adopted a calculated

25   business strategy that transferred ownership of the promissory notes executed by home loan

borrowers to persons that were not entitled to receive negotiation thereof under applicable law, and knew it but joined the conspiracy for purposes that amounted to greed.  Such conspiracy has continued to the date of filing hereof, but all Defendants with knowledge and malice aforethought.

70.   Defendant Countrywide and its various affiliates were among the leading providers of mortgages in California during all times relevant to this Complaint.  By 2005, Countrywide was the largest U.S. mortgage lender in the United States, originating over $490 billion in mortgage loans in 2005, over $450 billion in 2006, and over $408 billion in 2007.

71.   The other Defendants (or their predecessors in interest, such as WAMU and Wachovia) are the other largest home loan mortgage lenders in the United States, and were all involved in the conspiracy described herein.

72.   The *modus operandi* of the various Defendants was to use the numerous methodologies set forth in this Complaint to convert money and property from consumers after the origination of their loan.  By 2007, this *modus operandi* had evolved into a massive international Ponzi scheme relying upon foreign investor sources to secure and pay off money injected into the systems of the Defendants by prior lending sources and by Defendants' prior theft of borrower money (including Plaintiffs').

73.   As of the end of 2007, Defendants had no definitive and reliable knowledge regarding which foreign entity or entities in fact "owned" – as that term is defined under Article 3 of the Uniform Commercial Code – any promissory note secured by any deeds of trust or mortgages securing Plaintiff's real properties.

74.   Consequently, some of the largest offenders – Countrywide, WAMU, and Wachovia – became hopelessly insolvent and was literally forced by federal regulators to commence negotiations with various large bank to effectuate mergers designed to "clean up" these international Ponzi and conversion schemes.

75.   In 2007, Defendant BofA commenced negotiations to acquire Countrywide.  By late 2007, BofA began merging its operations with Countrywide and adopting some of Countrywide's practices.

76.   WAMU was one of the largest residential mortgage lenders in the United States. However, its predatory lending practices caused it to fail.  In September 2008, Chase purchased the assets and liabilities of WAMU for approximately $1.9 billion and began merging it into its operations into Chase by adopting some of its practices.

77.   In 2008, Wachovia was the fourth-largest bank holding company in the United States.   However, Wachovia began to fail due to its lending practices, including those described herein. In December 2008, Wells Fargo acquired the assets of Wachovia in order to prevent it from failing, and spent nearly three years merging its operations into Wells Fargo, including adopting some of its practices.

78.   All of the Defendants have taken steps to continue the Ponzi scheme described herein.  Specifically, they have continued to pool mortgage notes into pools for purposes of selling them as so-called mortgage-backed securities, thereby forever severing the promissory notes from the mortgages that secure them.

79.   The Defendants have also acted to foreclose upon homes owned by the Plaintiffs and other individuals by collecting payment in full through a device called mortgage default swap ("MDS"), whereby the defaulted mortgage would be replaced with a new one. The original lender had already been paid when it transferred the promissory note, so there was no loss to the lender.  These lenders foreclose anyway, meaning that they are being paid more than once for the same loan, leading to windfall profits when they sell the properties that they seize through foreclosure.

80.   The fraud perpetrated by the Defendants was willful and pervasive.  It began with simple greed and then accelerated when the lenders discovered that they could not sustain

their business, unless they (a) used their size and large market share to systematically create false and inflated property appraisals throughout the United States and with respect to each Plaintiff herein and (b) used their network of companies to convert money from unsuspecting borrowers in the United States, including Plaintiffs, who had good reason at the time to rely upon these fraudulent appraisals and concealment of their intentional, illegal activities.

81.    The Defendants then used these false property valuations, their resulting conversion of monies, and their ongoing Ponzi scheme to finance an operation of agents, including all Defendants and other parties, in order to induce the Plaintiffs and other borrowers into signing documents purportedly confirming ever-larger "refinancing" of their existing mortgages, or to execute promissory notes so that the Defendants could later convert more money and property from them.

82.    The Defendants either knew, or should have known, no later than 2004, that these loans were sustainable for the lenders and the borrowers and to a certainly either knew or should have known that their fraudulent activity would result in a crash that would consume the equity invested by the Plaintiffs and all other borrowers.

83.    The Defendants either knew, or should have known, no later than 2004, that the foregoing misconduct would result in their ability to convert monies from Plaintiffs (and thousands of other homeowners) subsequent to their pooling of these promissory notes as mortgage-backed securities ("MBS") that would be sold on the open market to various institutional investors for inflated values.

84.    This system led to the Defendants making multiple sales of the same promissory notes to multiple MBS pools.  These multiple sales of the same promissory notes to multiple buyers do not create ownership of such negotiable instrument under Article 3 of the Uniform Commercial Code.

85.     The plan to pool these loans into MBS offerings grew into a brazen plan to disregard underwriting standards and fraudulently inflate property values – county-by-county, city-by-city, person-by-person – in order to take business from legitimate mortgage-providers, and developed into a massive securities fraud that depended on the concealment from the deception of the Plaintiffs as to the true nature of these transactions on an unprecedented scale. In this way, the Defendants would be able to convert money from the Plaintiffs without such Plaintiffs having any idea or knowledge of the dirty and unlawful plot at the time it was being implemented.

86.     As early as 2004, the Defendants either knew or should have known that this scheme would cause a liquidity crisis that would devastate the Plaintiffs' home values and net worth.

87.     The Defendants did not care, because their plan was based on insider trading – pumping for as long as they could and then dumping before the truth came out and the theft and conversion of money and assets from Plaintiffs as well as the general public were locked in.

88.     Couched in banking and securities jargon, the deceptive gamble with consumers' primary assets – their homes – was nothing more than a financial theft and concurrent Ponzi scheme perpetrated by Defendants and their co-conspirators on a scale never before seen.

89.     This scheme led directly to a nationwide mortgage meltdown that was substantially worse than any economic problems facing the rest of the United States, thereby causing the failure of numerous lenders.

90.     From 2008 to the present, Americans' home values decreased substantially as a direct and proximate result of the Defendants' scheme set forth herein, leaving a large percentage of homeowners "upside down", meaning that they owe more on their home

mortgage loans than their homes are worth.  In some instances, those homes are so far upside down that it could take a decade or more for the homeowners to regain a positive position with respect to the value of their homes.

91.     This massive fraudulent scheme was a disaster both foreseen by the Defendants as well as waiting to happen.  Defendants knew it, and further knew that the taxpayer money would bail out those lenders deemed too big to fail.

92.     The lenders involved – Defendants herein – embarked on a plan and scheme to use the good faith of taxpayer money and the country's trust and confidence in the big banks that acquired Countrywide, WAMU, and Wachovia to (a) further hide their nefarious conversion scheme, (b) engage in additional acts of conversion and secreting of the knowledge thereof and (c) use new laws and initiatives as a basis to induce unsuspecting homeowners to fall further victim to their ongoing expansion of the foregoing scheme throughout the world.

93.     As a result, the Plaintiffs lost money and any ability to actually pay off their promissory notes, their credit ratings and histories were damaged or destroyed, and they also incurred material other costs and expenses, all as described herein.

94.     At the same time, Defendants converted from Plaintiffs and other borrowers across the country billions of dollars in interest payments and fees and generated billions of dollars in profits by vastly expanding the scheme previously unique to just a few predatory lenders such as Countrywide and now subject to the power of (a) a new, larger and more credible parents, such as BofA, Chase, and Wells Fargo and (b) the influx of new dollars in the form of taxpayer money and increased investment by investors knowledgeable of the Ponzi scheme to such an extent that they were co-conspirators in it.

95.     The Defendants then began to use their customers' most private information to maximize their illegal gains, ranging from the disclosure of the most private and confidential information of more than 2.4 million customers, to the outsourcing and sale of hundreds of

thousands of records to bolster their fraudulent scheme, disenfranchising citizens of their constitutional inalienable right of privacy.

96.     When the Defendants pooled the loans they originated and sold in MBS secondary mortgage market transactions, those lenders recorded gains on the sales.  In 2005, Countrywide reported $541.6 million in pre-tax earnings from capital market sales; in 2006, it recognized $553.5 million in pre-tax earnings from that activity.

97.     However, after the liquidity crisis hit, in 2007 it recognized a mere $14.9 million in pre-tax earnings from that activity and reported an overall pre-tax loss.

98.     In addition, there is a lot of confusion, even among the mortgage companies, as to the ownership history of many mortgage loans.  In the mad rush to convert home mortgages into securities to be bought and sold on Wall Street, investors did not want to spend the time or money necessary to keep track of ownership by filing papers in local recording offices.

99.     Investors by-passed the traditional systems and replaced them with the MERS system, which is not only inherently unreliable and unverifiable, it also remains outside the public eye.

100.    As a result, it is no longer possible for most Americans to go to their local courthouse and look at property records to find out who the owner of their mortgage currently is.

101.    To make matters worse, the Defendants established their concealment network now alleged entity-by-entity in this complaint, and this network has made it impossible to track the negotiation techniques and rights to possession of promissory notes, which are not publicly recordable.

102.    The illegal and improper acts of the Defendants have continued, including, *inter alia:* (i) engaging in the practice of "robo-signing," whereby the lenders used people who had no personal knowledge to sign fraudulent and perjured affidavits that indicated that they had

personal knowledge of those matters in an effort to deprive homeowners of their property without due process of law; (ii) refusing to modify loans; and (iii) refusing to entertain short sale opportunities, all with the intention to (a) buy time to further conceal previous conversions and/or (b)convert additional monies from the Plaintiffs in sum according to proof.

103.    Many of the Plaintiffs were told not to make mortgage payments and/or to sign letters authored by agents of Defendants, exacerbating a desperate financial situation that was either untrue or inflated at Defendants' insistence.  This was all done in order to buy time for Defendants to further secret the conversion of funds practiced against the Plaintiffs and to support other conversions of monies that Defendants were bent on practicing.

104.    Defendants have gone to great lengths to avoid identifying the location of monies and property converted by them from Plaintiffs.  The gigantic network of Defendants and their co-conspirators-companies formed in countries such as the Cayman Islands. Luxembourg, Gibraltar and Chile for the purpose of hiding assets and laundering money-has been, and continues to be, used to systematically hide and ultimately destroy the evidence revealing the method of conversion used and the location of the money and personally converted by Defendants.

105.    By these tactics, systems, and delays, Defendants intent to and are in fact buying time as they (a) accept the benefits of the Ponzi scheme and conversion activities described herein, (b) cover up their historical conversion and Ponzi scheme, and (c) make it materially more expensive and difficult for the Plaintiffs to locate their stolen assets and gain recompense.

106.    Defendants herein include some of our leading financial institutions – institutions upon which the Plaintiffs thought they could rely, and did in fact rely upon. However, their reliance was misplaced.  As is clear from the mounting number of federal and state enforcement actions against Defendants, it is now widely recognized that they have

1   committed numerous illegal acts in the process of operating their mortgage businesses.  BofA

2   alone has been sued for trillions of dollars as a result of its involvement in these activities.

3       107.    These acts remain ongoing, and continue to threaten the Plaintiffs'

4   constitutional rights and financial security, as well as the economic future of the United State

5   of America.

6       **D.     The scheme to convert the funds of the Plaintiffs**

7       108.    The Defendants either knew or should have known that the scale of the lending

8   – based on inflated property values, without income verification and in violation of numerous

9   other underwriting guidelines – would lead to widespread declines in property values, thereby

10  placing Plaintiff's and others into *extremis* through which they would lose the equity invested

11  in their homes and have no means of refinancing or selling, other than at a complete loss.

12      109.    That is precisely what happened to the Plaintiff's herein after Defendants

13  converted their money and the equity in their homes, but before Plaintiffs could have possibly

14  realized the ultimate purpose of the Defendants' scam.

15      110.    While the following quotation, taken from a regulatory report, refers

16  specifically to Countrywide, which was portrayed as a prudent, quality lender, it also applies to

17  the business practices of all Defendants.  "But the real Countrywide was very different.  We

18  allege it was a company that underwrote loans in a manner that layered risk factor upon risk

19  factor, such as reduced documentation . . . [a]lso concealed from investors were concerns

20  voiced by Countrywide's own Chief Credit Risk Officer, who warned that this 'supermarket'

21  strategy reduced Countrywide's underwriting guidelines to a 'composite of the riskiest

22  products being offered by all of their competitors combined.'"

23      111.    The Defendants held themselves out as makers of prime quality mortgage loans,

24  but instead hid the fact that they, in an effort to increase their respective market shares,

25  engaged in an "unprecedented expansion of its underwriting guidelines from 2005 and into

2007." Specifically, the Defendants developed what was referred to as a "supermarket" strategy, where they attempted to offer any product that was or might be offered by any competitor.

112.   By the end of 2006, Defendants' underwriting guidelines were as wide as they had ever been, and they were writing riskier and riskier loans.   Even these expansive underwriting guidelines were not sufficient to support their desired growth, so the lenders wrote an increasing number of loans as "exceptions" that failed to meet their already wide underwriting guidelines even though exception loans had a higher rate of default.

113.   The covert scheme of the Defendants was, like all such schemes based on deception, ultimately unsustainable.   The Defendants relied upon their sales of mortgages into the secondary marked through MBS instruments as an important source of revenue and liquidity.

114.   The Defendants not only covered up the poor quality of their loans and the liquidity crisis they created, they intentionally misrepresented to the public, in statements and in public filings, the nature of those loans in an effort to further defraud the public into continuing to borrow money and put their assets at risk.

115.   The Defendants' scheme eventually collapsed under its own weight, precipitating an economic crisis of unprecedented proportions.

116.   As defaults on these poorly underwritten loans increased, Defendants used the opportunity presented by the rising number of defaults to increase their fees and further convert other funds from Plaintiffs and other borrowers.

117.   To add insult to injury, as the number of defaults rapidly rose, the Defendants added unreasonable additional fees to the mortgages of homeowners who were desperately trying to save their homes, thereby boosting their profits at the expense of those who could least afford to bear that burden.

118.   Defendants did the foregoing with the intent to convert funds from the Plaintiffs and other members of the public.   The Plaintiffs did not now the massive scheme that the Defendants had devised and never knew until it was far too late to prevent the massive network being used across the globe to hide the trial of converted money and property.

119.   As a proximate and foreseeable result of the Defendants' sale of the promissory notes pertaining to the properties of the Plaintiffs and others similarly situated for more than the actual value of such instruments, the MBS securitization pools lacked the cash flow necessary to maintain them in accordance with the terms of their indentures.   The unraveling of Defendants' scheme has materially depressed the price of real estate throughout the country, including the real estate owned by the Plaintiffs, resulting in the losses to the Plaintiffs described herein.

120.   The Defendants have made use of wholly or partially owned foreign companies in an effort to continue to hide and to misrepresent the ownership of the promissory notes executed by the borrowers, including the Plaintiffs, who borrowed funds from them.

121.   BofA, Chase, and Wells Fargo have ratified the bad acts of WAMU, Countrywide, and Wachovia, by intentionally making use of foreign companies to frustrate the Plaintiffs and other borrowers seeking information about their lost money, mortgages and loan modifications.

## FIRST CAUSE OF ACTION

### Conversion

122.   All of the above Paragraphs of this Complaint are hereby incorporated by reference as though fully set forth herein.

123. All Defendants have demanded and received payments from the Plaintiffs based upon the claim of these Defendants that such monies are owned on the loans and promissory notes at issue herein.

124. These Defendants have further demanded and received from Plaintiffs payments, imbursements for late charges, penalty fees, and trial loan modification payments.

125. In truth, on information and belief, these Defendants had and have no legal right to be demanding such payments from the Plaintiffs for any loans or promissory notes or loan modification at issue herein because these Defendants are not holders or owners of the promissory notes in question and they no longer know who is.

126. Further, Defendants are not the authorized representative or agent for the holders or owners of the promissory notes in question.

127. In truth, the monies collected from the Plaintiffs by these Defendants was not credited for the benefit of the individual Plaintiffs involved, in that it was not used to pay down that Plaintiff's (or any Plaintiff's) principal and/or interest purportedly due on his or her promissory note.

128. Thus, in taking monies from Plaintiffs as describe above, these Defendants are liable to Plaintiffs herein for conversion, i.e., the act of dominion wrongfully exerted over another person's personal property.

129. These claims of conversion are based upon the facts that a) each Plaintiff had ownership and the right to possession of the monies taken from him by these Defendants as described above; b) these Defendants acted wrongfully by receiving such money under the guise that the Defendants were entitled to the money, when in fact they were and are not entitle to any such payment; c) no money collected by these Defendants from these Plaintiffs was credited to the benefit of the individual Plaintiff involved for the pay down of any principal or interest purportedly due on that Plaintiff's note; and d) each Plaintiff suffered general and

1   special damages, including loss of the money that was taken from them by these Defendants

2   through this subterfuge, according to proof.

3   130.   These Defendants also committed conversion as against each Plaintiff by

4   converting equity that previously existed in each Plaintiff's home – in sums according to proof

5   – by surcharging against that equity various false "reserves" in the form of "insurance" or "tax"

6   or "general" reserve imbursements, which were then recorded as debts against the property of

7   the individual Plaintiff involved.

8   131.   Just as banks are liable to a customer and must credit his account for conversion

9   when banks pay on a forged endorsement of a commercial instrument, so too are these

10  Defendants liable for these false surcharges improperly charged against a Plaintiff's account.

11  132.   As a direct and proximate result of the conversion committed by the

12  Defendants, each Plaintiff suffered general and special damages according to proof.

13  133.   Each Plaintiff is further entitled to restitution of those amounts wrongfully

14  converted from him or her.

15  134.   These Defendants willfully committed the wrongdoing against each Plaintiff as

16  described herein and knowingly chose to deceive him or her in the above described manner.

17  Thus, the acts of these Defendants were malicious and performed with a callous disregard for

18  Plaintiff's legal rights. Plaintiffs are therefore entitled to punitive damages.  Plaintiffs are

19  further entitled to attorney fees under whatever contract or statue applies.

20  135.   All Defendants have converted and stolen – in the manner, using the means of

21  interstate commerce as set forth herein – the sum of at least between $40,000.00 and

22  $60,000.00, from each Plaintiff herein.

23  136.   In no event has any Plaintiff herein suffered damages greater than $75,000.00

24

25                          **SECOND CAUSE OF ACTION**

## Conspiracy to Commit Conversion

137.   All of the above Paragraphs of this Complaint are hereby incorporated by reference as though fully set forth herein.

138.   Plaintiffs allege that each of the wrongful acts or omissions described in the First Cause of Action for Conversion above was either performed by each Defendant herein, named or unnamed, or ratified and adopted by each Defendant after its occurrence.

139.   Further, those Defendants that did not actively perform the acts or omissions described here did affirmatively aid and abet the other Defendants in the performance of such acts or omissions, either before, during, or after the fact in the form of concealment and secretion activities worldwide.  Such activities represent additional acts of conversion under law.

140.   Finally, each Defendant herein named, or unnamed, did knowingly derive some form of profit or benefit from the acts and omissions described herein.  All Defendants agreed to work together in the conspiracy and/or joint enterprise described in this Cause of Action as set forth herein.  Accordingly, each Defendant, named or unnamed, should be held liable for conspiracy to commit the conversion as alleged in the First Cause of Action.

141.   The Plaintiffs are entitled to the damages as alleged and described in the First Cause of Action – and as alleged above – as a direct and proximate result of this conspiracy of all Defendants to commit repeated and serial acts of conversion against these Plaintiffs as described herein.

142.   Those Defendants willfully committed the wrongdoing against each Plaintiff as described herein and knowingly chose to deceive him in the above-described manner.  Thus, the acts of these Defendants were malicious and performed with a callous disregard for Plaintiffs' legal rights.  Plaintiffs are therefore entitled to punitive damages.

143.   In no events has any Plaintiff herein suffered damages greater than $75,000.00.

## THIRD CAUSE OF ACTION

### Intentional Misrepresentation

144.   All of the above Paragraphs of this Complaint are hereby incorporated by reference as though fully set forth herein.

145.   The Defendants intentionally misrepresented to the Plaintiffs and to the consuming public in general their intentions regarding the reasonableness and appropriateness of their underwriting procedures in making mortgage loans to the Plaintiffs, and also materially misrepresented to the consuming public that they were not making quality loans when they told the consuming public that they were only making quality, prime home loans.

146.   The Defendants intentionally misrepresented to the public at large the status of their liquidity and the quality of the loans that they were making.

147.   Those Defendants further intentionally misrepresented to the Plaintiffs that they would not use or otherwise impose unreasonable or unfair charges against the Plaintiffs and the rest of the consuming public, but they failed to do so.

148.   The campaign, misinformation and partial information described in this Cause of Action as well as in the rest of this Complaint were intended to be repeated and also to be broadly disseminated through the media, analyst reports and individual communications, and it was.

149.   It was intended to become part of the well-understood "givens" among homeowners and prospective homeowners seeking mortgages, and it did so become part of the lexicon of homeownership and mortgage choices.

150.   These Plaintiffs relied upon the misrepresentations and entered into mortgages with the Defendants.

151.   All of said intentional misrepresentations and omissions were made by the Defendants with the intent to induce the consuming public, including the Plaintiffs, to enter into mortgage loan transactions that would deprive them of the equity in their homes.

152.   By reason of the prominence of the Defendants and their campaign of deception as to their business plans and the relationship of trust developed between each of the Defendants and the Plaintiffs, Plaintiffs were justified in relying upon Defendants' representations.

153.   At all times pertinent, the Plaintiffs in fact reasonably relied upon the representations made by the Defendants that they would use reasonable and rational underwriting guidelines in making mortgage loans to the consuming public and entered into mortgage loan contracts with the Defendants, all to their injury and detriment.

154.   In fact, the appraisals were inflated.  The Defendants did not utilize appropriate underwriting processes.  The financial condition of the various Defendants was not sound, but rather was a house of cards ready to collapse.  Further, Plaintiffs' mortgages were not refinanced with fixed rate mortgages as they were told they would be, and the Defendants never intended that they would be.

155.   As a result of Defendants' scheme described herein, these Plaintiffs could not afford their adjustable rate mortgages when their variable rate features and/or balloon payments kicked in.

156.   Further, and as a result of the nefarious scheme of the Defendants, the Plaintiffs could not refinance or sell their residences without suffering a loss of their equity investments.

157.   As a result of the foregoing acts of conversion and fraud, the Plaintiffs have lost all or a substantial portion of the equity invested in their houses and suffered reduced credit ratings and increased borrowing costs, among other damages described herein.

158.   As a result of the Defendants' misconduct alleged above, all negotiable instruments appertaining or relating to Plaintiffs – whether or not an original or any copy thereof is held by Defendants or any of their co-conspirators in their money laundering schemes – may be declared to be *void ab initio* as determined by the trier of fact.  In the event of such a finding by the trier of fact – that these negotiable instruments are *void ab initio* – leads to a recovery for any Plaintiff, along with all damages awarded herein, of a sum total of more than $75,000.00.  Nothing set forth herein, however, should be construed to infer that Plaintiffs agree to deprive the trier of fact of the right to adjudicate whether negotiable instruments pertaining to them were or were not *void ab initio,* as such a determination will impact the predicate conduct required for an award of punitive damages and may impact other areas of Plaintiffs' case such that they are not required to, and do not, in fact, agree to allow such critical issue to avoid scrutiny by the trier of fact in this case.

159.   These Plaintiffs are further entitled to punitive damages in order to punish these Defendants for their malicious, oppressive and willful conduct as described.

160.   Inclusive of all compensatory damages, special damages, attorney fees and punitive damages alleged herein, each Plaintiff has sustained damage in a sum of greater than $75,000.00

## FOURTH CAUSE OF ACTION

### Intentional Misrepresentation

161.   All of the above Paragraphs of this Complaint are hereby incorporated by reference as though fully set forth herein.

162.   In addition to the numerous acts of fraud described above, the Defendants represented to multiple Plaintiffs and to the consuming public in general that the Defendants would assist them in accomplishing a loan modification.   As described herein, those representations were false.

163.   Defendants knew that their representations regarding their willingness to enter into loan modification agreements were false when they made them.

164.   Because of new laws pertaining to loan modifications combined with the insistence of the Defendants that they had a genuine interest in complying therewith and in keeping borrowers in their homes, the Plaintiffs reasonably relied on these materially false misrepresentations made by the Defendants.

165.   By delaying the Plaintiffs from pursuing their rights and by increasing the costs of the Plaintiffs combined with the continuing erosion of each Plaintiff's credit rating, each Plaintiff's reliance harmed that particular Plaintiff.

166.   The Plaintiff's reliance on the representations made by the Defendants was a substantial factor in causing harm to them.

167.   Without limiting the damages as described elsewhere in this Complaint, the damages of the Plaintiffs arising from the matters complained of in this Cause of Action also include the loss of equity in their houses, costs, and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorney fees and costs.

168.   The Plaintiffs are entitled to recover general and special damages directly and proximately resulting from the Defendants' intentional deceit and misrepresentations.

169.   These Plaintiffs are further entitled to punitive damages in order to punish these Defendants for their malicious, oppressive and willful conduct as herein described.

170.   Inclusive of all compensatory damages, special damages, attorney fees and punitive damages alleged herein, each Plaintiff has sustained damage in sum of greater than $75,000.00.

## FIFTH CAUSE OF ACTION

### Fraudulent Concealment

171.   All of the above Paragraphs of this Complaint are hereby incorporated by reference as though fully set forth herein.

172.   Defendants have offered to help the Plaintiffs with obtaining "loan modifications" while concealing from these Plaintiffs the fact that, upon information and belief, these Defendants are not the rightful owners and/or holders of the subject promissory note associated with their mortgages.

173.   The Defendants have also failed to disclose that they are not the legal representatives or agents of such persons, and they have further failed to disclose that the Defendants' entire motivation and purpose in doing so has been, and continues to be, the conversion of Plaintiffs' monies and the taking of their homes in violation of law.

174.   Thus, these Defendants are legally incapable to be able to enter into loan modifications with any Plaintiff.

175.   Despite the fact, the Defendants have had and continue to have a vested interest in "offering loan modifications" to borrowers, including the Plaintiffs, because they can make a profit from continuing to cover up the industry-wide scheme alleged above and to create an environment where they can commit additional acts of fraud and conversion.

176.   In fraudulently offering loan modifications to Plaintiffs, the Defendants have convinced Plaintiffs that loan modifications will only be given to those borrowers that are delinquent on their loans and/or in default.

177.   The Defendants have made these statements on an industry-wide basis in order to permit them to continue their scheme of obtaining monies and properties from Plaintiffs wrongfully and in violation of law.

178.   In reliance upon these materially false representations, and in the belief that they would be able to obtain loan modifications if they followed these false and misleading instructions, Plaintiffs have permitted their loans to go delinquent and/or into default, believing this step to be a requisite of the loan modification process.

179.   At all times relevant, the Defendants possessed superior knowledge to that of the Plaintiffs, and further had access to material facts that were not accessible to the Plaintiffs regarding their nefarious scheme to induce the Plaintiffs to permit their mortgages to go into default in the hope of obtaining loan modification.

180.   At all times relevant, Defendants had an affirmative duty to disclose to the Plaintiffs that Defendants had no legal authority to offer loan modifications.

181.   However, the Defendants have hidden and suppressed the fact that they do not own the subject promissory notes and hence have no legal or contractual authority to offer such loan modifications.

182.   The Defendants also had an affirmative duty to disclose to the Plaintiffs that Plaintiffs did not have to be in default on their loans in order to qualify for loan modifications.

183.   Defendants have induced the Plaintiffs into allowing their loans to go into default by telling Plaintiffs it was a requirement for becoming eligible for a loan modification.

184.   In truth, under applicable law in effect since 2009, a borrower is *not* required to be delinquent and/or in default with his loan in order to be eligible for a loan modification.

185.   Defendants have only claimed that borrowers must be in default, in violation of law, because Defendants can realize more profit and commit more acts of conversion when a borrower is actually in default, i.e., at least 90 days behind in his loan payment.

186.   After Defendants profited by their deceit and concealment, they then continued demanding and collecting monies from Plaintiffs, constituting outright conversion.

187.   The fact that these Plaintiffs did *not* need to be delinquent on their loans and/or in default in order to qualify for loan modifications has been hidden and suppressed from these Plaintiffs by Defendants and continues to be hidden.

188.   The Defendants should have disclosed these suppressed facts to the Plaintiffs because they were material to the cost-benefit analysis that should have and could have been undertaken by each Plaintiff.

189.   Had the true facts been disclosed to the Plaintiffs, knowledge of those material facts likely have caused each Plaintiff (a) to act differentially than he or she did while not knowing the facts hidden from him by Defendants, and (b) to protect himself or herself by not preventing his or her funds from being converted by Defendants.

190.   The Defendants knew  these suppressed facts and further knew at the of their suppression, that such suppression and concealment would cause each Plaintiff to act in a way that was injurious to him or hear while at the same time being profitable to Defendants.

191.   When suppressing and concealing form the Plaintiffs these material facts as herein alleged, Defendants intended to induced each such Plaintiff to alter his or her position to his or her harm.

192.   Each Plaintiff justifiably and reasonably relied on the fraudulent concealment created by these Defendants in their suppression and concealment of the material facts described above.

193.   Once a Plaintiff became delinquent in his or her loan Payments, Defendants then acted to ensure that the delinquency became a default under the terms of the loan documents.

194.   Defendants achieved this by asking each Plaintiff applying for a loan modification to submit the   Proper application and paperwork. Once a Plaintiff submitted all documents as requested, the Defendants then claimed to have "lost" the Plaintiff's application package, necessitating the re-submission of such documents by each Plaintiff hoping to quality for a loan modification.

195.   During this process, Defendants would collect and convert the maximum amount of money from Plaintiffs in sums according to proof.

196.   This Process of "losing the paperwork" and requiring re submission thereof necessarily ensured that a Plaintiff's one or two-month "delinquency" automatically became a "default" and an event requiring significant payments to Defendants to cure said "default," all of which constituted misappropriation and conversion of funds under law.

197.   These Defendants regularly dragged out this process for months and months when dealing with Plaintiffs in need of loan modifications. They did so by claiming over and over again to have "lost" the paperwork of the borrower involved.

198.   Each Plaintiff was directly and proximately harmed by Defendants' Fraudulent concealment of facts described herein.

199.   Plaintiffs have incurred additional costs and charges and late fees as a result of being told that they needed to be delinquent in their loans in order to obtain a loan modification.

200.   Plaintiffs have gone into default and even lost their homes through foreclosure as the result of the same fraudulent concealment by Defendants.

201.   Further, Plaintiffs have had their credit profiles destroyed by allowing their loans to go into default as instructed by Defendants.

202.   Accordingly, each Plaintiff is entitled to general and special damages according to proof at trial.

203.    Further, the Defendants acted outrageously and persistently with actual malice in suppressing the facts and circumstances set forth, and they continue to do so. Accordingly, the Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof.

204.    The Defendants willfully committed the wrongdoing against each Plaintiff as described herein and knowingly chose to deceive him in the above-described manner. Thus, the acts of the Defendants were malicious and performed with a callous disregard for Plaintiffs' legal rights. Plaintiffs are therefore entitled to punitive damages. Plaintiffs are further entitled to attorney fees under whatever contractor or statute applies.

205.    Inclusive of all compensatory damages, special damages, attorney fees and punitive damages alleged herein, no Plaintiff has sustained damage in a sum greater than $75,000.00.

## SIXTH CAUSE OF ACTION

### Fraudulent Concealment

206.    All of the above Paragraphs of this Complaint are hereby incorporated by reference as through fully set forth herein.

207.    As set forth in the Fifth Cause of Action, the Defendants used fraud and artifice to lure borrowers into defaulting upon their mortgages by promising them loan modifications when they had no intention of providing such loan modifications.

208.    Once the Defendants lured a borrower into default, then the Defendants collected upon "credit default swaps" ("CDS'S").

209.    CDS's been and are used to insure mortgage-backed securities, and investor trading in these two instruments was the cause of the mortgage that occurred in this country.

210.   A CDS is a form of insurance that is actually a bet *against* the subject loan being paid on time as agreed. CDS's ensure that Defendants can collect on every loan that goes bad by going into default.

211.   If a borrower default upon a mortgage that was pooled into an MBS, the buyer of the CDS makes a series of payments (the CDS "fee" or "spread") to the seller and, in exchange, receives a payoff if the loan defaults .Thus, the original lender was paid when it sold the promissory note executed by the borrower, and the MBS pool was also paid in full by virtue of the CDS payments received.#

212.   This, then, constitutes the number one reason that the Defendants wanted each Plaintiff to actually default on his or her loan: The Defendants bet against each Plaintiff by buying CDS's on every loan they allegedly service, and then trying to get that loan into default so that the Defendants can collect on this "side bet."

213.   The fact that the Defendants were motivated to see that each Plaintiff failed to pay their mortgages on time and thus ended up in default so that the Defendants could collect on their CDS side bet has been hidden and suppressed from Plaintiffs by the Defendants.

214.   The suppressed facts and circumstances described herein should have been disclosed to the Plaintiffs by the Defendants because such facts and circumstances were material in that they were essential to the analysis that should and could have been undertaken by each Plaintiff in determining whether to enter into a loan transaction with the Defendants, and would likely have caused each Plaintiff to act differently than he did while not knowing the facts hidden from him by Defendants.

215.   These suppressed facts and circumstances were known to the Defendants at the time they were hidden from Plaintiffs.

216.   Further, the Defendants knew at the time of suppression and concealment that such suppression and concealment would cause each Plaintiff to act in a way that was injurious to him while at the same time being profitable to the Defendants.

217.   When suppressing and concealing from these Plaintiffs the facts and circumstances herein described, the Defendants intended to induce each Plaintiff to alter his position to his harm.

218.   Each Plaintiff justifiably and reasonably relied on the fraudulent concealment created by Defendants in their suppression of the facts and circumstances described in this Cause of Action.

219.   Defendants' receipt of money from CDS's coupled with their later receipt of money from Plaintiffs means that the Defendants have received a windfall in the form of gaining either ownership of the real property of borrowers, or the value of that real property, and is malicious, outrageous, and entitles Plaintiffs to recover exemplary and punitive damages in a sum according to proof.

220.   The Defendants knowingly and willfully committed the wrongdoing against each Plaintiff as described herein and knowingly chose to deceive him in the above-described manner. Thus, the acts of Defendants were malicious and performed with a callous disregard for Plaintiffs' legal rights. Plaintiffs are therefore entitled to punitive damages. Plaintiffs are further entitled to attorney fees.

221.   Inclusive of all compensatory damages, special damages, attorney fees and punitive damages alleged herein, no Plaintiff has sustained damage in a sum greater than $75,000.00.

## SEVENTH CAUSE OF ACTION

### Promissory Estoppel

222.   All of the above Paragraphs of this Complaint are hereby incorporated by reference as though fully set forth herein.

223.   Each Plaintiff herein attempted to take steps to save his or her house once it became apparent that Defendants intended to foreclose against them. Some Plaintiffs considered failing bankruptcy as a valid and viable means to save their homes. Other Plaintiffs investigated other possible ways to avoid losing possession of their homes due to Defendants' wrongful tactics as set forth above.

224.   In each instance, Defendants promised to Plaintiffs that there was no need to file bankruptcy or pursue other ways to avoid foreclosure because Defendants would forego the foreclosure process and would instead "work with" each Plaintiff to modify the terms of the home loan in question, thereby making it possible for each Plaintiff to make the necessary monthly payments.

225.   In reliance on the promises made by Defendants not to foreclose and to instead "work with" each Plaintiff, each Plaintiff reasonably decided not to file for bankruptcy or to investigate other possible scenarios to stave off impending foreclosure.

226.   Instead of cooperating with each Plaintiff and working with them to modify each loan at issue, Defendants instead have proceeded with various levels of conversion and/ or foreclosure proceedings against each Plaintiff herein.

227.   In reasonable reliance on Defendants' promises not to foreclose, each Plaintiff has suffered direct and proximate damages as a result of Defendants' bad-faith of promises to exceed $75,000.00.   Each Plaintiff is therefore entitled to compensatory damages according to proof within these limitations, in order to make him or her whole.

## EIGHTH CAUSE OF ACTION

### Negligent Misrepresentation

228.    All of the above Paragraphs of this Complaint are hereby incorporated by reference as though fully set forth herein.

229.    Because the Plaintiffs relied upon the Defendants to guide them through the process of making and later servicing their home mortgage loans, a special relationship exists between the Plaintiff and the Defendants.

230.    The existence of that special relation imposed upon the Defendants a duty to fully and accurately disclose all pertinent information pertaining to those home loans to the Plaintiffs, including, but not limited to, true and correct information pertaining to the securitization of their notes, the existence of CDS, and the fact that the Defendant lenders had no legal right to foreclose upon their mortgages once the promissory notes became the basis for MBS pools.

231.    Defendants failed to disclose this material information to the Defendants, or omitted critical elements from the disclosures that were made.

232.    The Plaintiffs reasonably relied upon the material misrepresentations of the Defendants to their detriment in choosing to proceed with their mortgage loan transactions.

233.    As a consequence of the negligent misrepresentations made by the Defendant to the Plaintiffs, no Plaintiff herein has suffered damages greater than $75,000.00.

234.    Plaintiffs allege that each of the wrongful acts or omissions described in this Cause of Action was performed by each Defendant herein, named or unnamed, or ratified and adopted by each Defendant after its occurrence. Further, those Defendants that did not actively perform the acts or omissions described here did affirmatively aid and abet the other Defendants in the performance of such acts or omissions, before, during or after the fact.

235.    Finally, each Defendant herein, named or unnamed, did knowingly derived some form of profit or benefit from the acts and omissions described herein. All Defendants agreed to work together in the conspiracy and/or joint enterprise described in this paragraph as

that conspiracy is alleged above. Accordingly, each Defendant, named or unnamed, should be held liable for the acts and omissions complained of.

## NINTH CAUSE OF ACTION

### Breach of the Covenant of Good Faith and Fair Dealing

236.    All of the above Paragraphs of this Complaint are hereby incorporated by reference as though fully set forth herein.

237.    In each and every mortgage note signed by the Plaintiffs, and in each and every mortgage instrument signed by the Plaintiffs in favor of the Defendants, is implied a covenant of good faith and fair dealing between the parties.

238.    The implied obligation encompasses any promises which a reasonable person in Plaintiffs' position would be justified in understanding was included in the parties' agreement.

239.    The Defendants have breached that covenant of good faith and fair dealing by intentionally and/or negligently misrepresenting or omitting to disclose material facts that would have been pertinent to those Plaintiff's decisions to enter into transactions with the Defendants.

240.    As a consequence of the breaches of the covenant of good faith and fair dealing by the Defendants, the Plaintiffs have been deprived of the right to receive the benefits under those loan agreements, to-wit; they have been stripped of the value and equity in their homes as a consequence.

241.    Inclusive of all recoverable damages and restitution and costs and attorney fees, each plaintiff has sustained damage restitution in the sum of more than $75,000.00.

242.    Plaintiffs allege that each of the wrongful acts or omissions described in this Cause of Action was either performed by each Defendant herein, named or unnamed, or ratified and adopted by each Defendant after its occurrence. Further, those Defendants that did

not actively perform the acts or omissions described here did affirmatively aid and abet the other Defendants in the performance of such acts, or omissions, before, during or after the fact.

243.   Finally, each Defendant herein, named or unnamed, did knowingly derive some form of profit or benefit from the acts and omissions described herein. All Defendants agreed to work together in the conspiracy and/or joint enterprise described in this paragraph in the manner set forth herein. Accordingly, each Defendant, named or unnamed, should be held liable for the acts and omissions complained of.

### TENTH CAUSE OF ACTION

### <u>Unjust Enrichment</u>

244.   All of the above Paragraphs of this Complaint are hereby incorporated by reference as thought fully forth herein.

245.   Through their conduct as described herein, all Defendants herein were unjustly enriched at the expense of each Plaintiff and by taking his or her money under false pretenses and by ultimately foreclosing or attempting to foreclose upon the homes of the Plaintiffs without legal authority to do so.

246.   To permit the Defendants to retain their unjust gains would be against equity and good conscience, and would ratify the illegal actions taken by the Defendant to the detriment of the Plaintiffs.

247.   Here, in order to avoid the unjust enrichment of the Defendants, each Defendant should be ordered to pay back to each Plaintiff any and all monies unjustly received from him or her. All inclusive, no Plaintiff herein has suffered damages greater than $75,000.00.

248.   Plaintiffs allege that each of the wrongful acts or omissions described above was performed by each Defendant herein, named or unnamed, or ratified and adopted by each Defendant after it occurrence. Further, those Defendants that did not actively perform the acts

or omissions described here did affirmatively aid and abet the other Defendants in the performance of such acts of omissions, before, during or after the fact.

249.   Finally, each Defendant herein, named or unnamed, did knowingly derive some form of profit or benefit from the acts and omissions described herein. All Defendants agreed to work together in the conspiracy and/or joint enterprise described in this paragraph in the manner set forth above. Accordingly, each Defendant, named or unnamed, should be held liable for the acts and omissions complained of.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, and each of them as follows and as set forth in each cause of action:

1.   General and special damages according to proof;

2.   Punitive damages according to proof;

3.   Statutory relied under the specific statutes cited above;

4.   Restitution damages according to proof;

5.   Pre- and post-judgment interest; and

6.   Attorney fees as authorized and provided for by statute, contract or otherwise; and

7.   On all causes of action, for such other and further relief as this Court may deem just and proper so that each Plaintiff shall recover more than $75,000.00 in total monetary damages and that each Plaintiff shall receive a judicial determination that his or her mortgage lien(s) at issue herein as alleged to exist by Defendants is *ab initio*.

Respectfully submitted,

OF COUNSEL:

/S/PETER NISSON, ESQ

**PETER NISSON, ESQ**              **SBN#62276**
100 North Brand Blvd. Suite 14
Glendale, CA 91203
c/o TBFC
1888 Kalakaua Avenue Suite C-312
Honolulu, HI 96815
Tel. No. (888)999-4313
FAX      (888) 999-5764
info@nissonlaw.com
Attorney for Plaintiffs

Appearing in Hawaii Jurisdiction Pro Hac Vice
**JURY DEMAND**

Plaintiffs demand that this matter be tried to a jury as permitted by law.